JMW
H-1-2013

___ FILED   ___ ENTERED
___ LOGGED   ___ RECEIVED

RRH/AD: USAO#2012R00316

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

APR 0 2 2013

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | **CRIMINAL NO.** |
| | *ELH-13-0151* |
| v. | **(Racketeering Conspiracy, 18** |
| | **U.S.C. § 1962(d); Conspiracy to** |
| TAVON WHITE, | **Distribute and Possess with Intent** |
|    a/k/a "Bulldog," "Tay," | **to Distribute Drugs, 21 U.S.C. §** |
| ANTONIA ALLISON, | **846; Possession with Intent to** |
| JAMAR ANDERSON, | **Distribute Drugs, 21 U.S.C. §** |
|    a/k/a "Hammer," | **841(a); Money Laundering** |
|       "Hamma Head," | **Conspiracy, 18 U.S.C. § 1956(h);** |
| EBONEE BRASWELL, | **Aiding and Abetting, 18 U.S.C. § 2,** |
| CHANIA BROOKS, | **Criminal Forfeiture 21 U.S.C. §** |
| KIMBERLY DENNIS, | **853)** |
| DERIUS DUNCAN, | |
| JASMIN JONES, | |
|    a/k/a "J.J.," | **UNDER SEAL** |
| TARYN KIRKLAND, | |
| KATRINA LAPRADE, | |
|    a/k/a Katrina Lyons, | |
| TIFFANY LINDER, | |
| STEVEN LONEY, | |
|    a/k/a "Stevie," | |
| VIVIAN MATTHEWS, | |
| TYESHA MAYO, | |
| JERMAINE McFADDEN, | |
|    a/k/a "Maine," | |
| JENNIFER OWENS, | |
|    a/k/a "O," "J.O.," | |
| KENNETH PARHAM, | |
| TESHAWN PINDER, | |
| ADRENA RICE, | |
| KATERA STEVENSON, | |

a/k/a "KK,"                                    :
TYRONE THOMPSON,                               :
    a/k/a "Henry,"         :
                            :
JASMINE THORNTON,                              :
    a/k/a "J.T.'"          :
RALPH TIMMONS, JR.,                            :
    a/k/a "Boosa,"         :
JAMES YARBOROUGH,                              :
    a/k/a "J.Y.,"          :
                            :
JOSEPH YOUNG,                                  :
    a/k/a "Monster,"       :
        DEFENDANTS   :
                            :

.oOo.

## INDICTMENT

## COUNT ONE

The Grand Jury for the District of Maryland charges that:

1.    The Black Guerilla Family (BGF) is a nationwide gang operating in prisons and on the streets of major cities throughout the United States.  Founded in California in the 1960s, BGF appeared in the Maryland correctional system in the 1990s.  Although still a prison gang, BGF is increasingly involved in criminal activity on the streets of cities in Maryland, including narcotics trafficking, robbery, assault and murder.

2.    At all times relevant to this Indictment, the membership of BGF was organized into units corresponding to a particular correctional facility or

neighborhood of Baltimore City.  These units are called "regimes" or "bubbles" or "bubble regimes."  Units are organized hierarchically with a commander and various subordinates, some of whom have specialized functions such as the collection of dues.

3.      At all times relevant to this Indictment, BGF members were required to follow a code of conduct.  Members who violate this code or who disobey an order from a superior are subjected to disciplinary measures called "sanctions" which include fines, physical beatings, stabbings and murders administered by other BGF members.

4.      In Baltimore, Maryland, pretrial detainees are held downtown in the Baltimore City Detention Center (BCDC) and in several connected facilities, especially the Baltimore Central Booking Intake Center (BCBIC), the Women's Detention Center (WDC), which housed many men, and the Jail Industries (JI) Building [henceforth "BCDC and related prison facilities"].

5.      In or about 2006, BGF became the dominant prison gang at BCDC and related prison facilities.  By this time, the proliferation of cell phones inside of prisons enabled leaders of BGF to coordinate activities outside BCDC and related prison facilities, to pass down and receive orders, and to arrange the smuggling of controlled substances and other contraband into the prisons, often

through corrupt corrections officers (CO's) who became members and associates of BGF.

6.      At all times relevant to this Indictment, BGF members and associates in BCDC and related prison facilities engaged in criminal activities including, but not limited to, trafficking in controlled substances, bribery, extortion, money laundering, obstruction of justice, assault, robbery, murder and witness retaliation.

7.      At all times relevant to this Indictment, BGF members and associates smuggled controlled substances, cell phones, tobacco and other contraband into BCDC and related prison facilities.

8.      At all times relevant to this Indictment, BGF members and associates bribed CO's and other employees and contractors at BCDC and related prison facilities to assist in smuggling contraband, avoiding interdiction and law enforcement efforts, and concealing the activities of the enterprise.  By accepting bribes, including shares of the drug-trafficking profits, and by continually assisting in these ways, CO's and other employees became associates of the enterprise.

9.      BGF including its leadership, members and associates constituted an "enterprise," as defined by Section 1961(4) of Title 18, United States Code, that

is, a group of individuals, which engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

### Purposes of BGF at BCDC

10.    Among the purposes of the enterprise were the following:

a.    Enriching the members and associates of the enterprise and promoting their activities through, among other things, the distribution of controlled substances, and money laundering.

b.    Preserving and protecting the power, territory and profits of the enterprise by monopolizing and attempting to monopolize access to controlled substances inside BCDC and related prison facilities, retaliating against individuals and organizations through the use of intimidation, bribery, assault, violence, threats of violence, and witness retaliation.

c.    Preventing the arrest and prosecution of members and associates through obstruction of justice, intimidation, bribery, assault, violence, threats of violence, and witness retaliation.

d.    Controlling many of the CO's and other employees inside BCDC and related prison facilities and securing their commitment as associates

of the enterprise in order to obtain sex, drugs and other contraband, to maximize the freedom and privileges of BGF members and associates, and to gather intelligence in order to thwart contraband interdiction initiatives and other law enforcement efforts against BGF inmates inside BCDC.

e.      Carrying out instructions from BGF leaders outside BCDC and financially supporting BGF outside BCDC with membership dues and profits from trafficking in contraband.

## The Racketeering Violation

11.      Beginning at a date unknown to the Grand Jury, but at least by in or about 2009, through on or about the date of this Indictment, in the District of Maryland, and elsewhere, the defendants,

**TAVON WHITE,**
**a/k/a "Bulldog," "Tay,"**
**ANTONIA ALLISON,**
**JAMAR ANDERSON,**
**a/k/a "Hammer,"**
**"Hamma Head,"**
**EBONEE BRASWELL,**
**CHANIA BROOKS,**
**KIMBERLY DENNIS,**
**DERIUS DUNCAN,**
**JASMIN JONES,**
**a/k/a "JJ"**
**TARYN KIRKLAND,**
**KATRINA LAPRADE,**

a/k/a Katrina Lyons,
TIFFANY LINDER,
STEVEN LONEY,
a/k/a "Stevie,"
VIVIAN MATTHEWS,
TYESHA MAYO,
JERMAINE McFADDEN,
a/k/a "Maine,"
JENNIFER OWENS,
a/k/a "O," "J.O.,"
KENNETH PARHAM,
TESHAWN PINDER
ADRENA RICE,
KATERA STEVENSON,
a/k/a "KK,"
TYRONE THOMPSON,
a/k/a "Henry,"
JASMINE THORNTON,
a/k/a "JT'"
RALPH TIMMONS, JR.,
a/k/a "Boosa,"
JAMES YARBOROUGH,
a/k/a "J.Y.,"
JOSEPH YOUNG,
a/k/a "Monster,"

being persons employed by and associated with BGF, an enterprise, which

engaged in, and the activities of which affected, interstate and foreign commerce,

together with persons known and unknown to the Grand Jury, did knowingly,

intentionally, and unlawfully combine, conspire, confederate, and agree to violate

Section 1962(c) of Title 18, United States Code, that is, to conduct and

participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, multiple acts involving:

      A.    21 U.S.C. § 846 (conspiracy to distribute a controlled substance);

      B.    21 U.S.C. § 841 (distribution and possession with intent to distribute a controlled substance);

      C.    18 U.S.C. § 1956 (money laundering);

      D.    18 U.S.C. § 1513 (retaliating against witnesses, victims and informants) ;

      E.    Bribery, chargeable under MD. CODE ANN., Crim. L. § 9-201 (Maryland bribery of public employee);

      F.    Extortion, chargeable under MD. CODE ANN., Crim. L. § 3-701 (Maryland extortion); and § 3-705 (Maryland extortion by verbal threat).

## Methods and Means of BGF

12.    Among the means and methods by which the defendants and their associates conducted and participated in the affairs of the enterprise were the following:

      a.    BGF members and associates used cell phones to obtain contraband by placing orders with fellow members and associates outside the

facility who would buy the contraband and turn it over to CO's who were members and associates of the enterprise and who would smuggle the contraband into BCDC and related prison facilities. CO's who were members and associates of the enterprise coordinated contraband trafficking and payment with members and associates who were inmates and with persons outside the prison.

        b.     Among the contraband smuggled into BCDC and related prison facilities in this way by BGF members and associates were controlled substances, especially Schedule I and II semi-synthetic opioids such as oxycodone (including Percocet, OxyContin), methadone, buprenorphine (including Suboxone); and Schedule III and IV benzodiazepine drugs (including Xanax, Klonopin) and hydrocodone (including Lortab, Lorcet, Vicodin); as well as marijuana. BCDC was replete with these controlled substances which were sold both to members and associates of BGF and to non-members in order to make money.

        c.     BGF members and associates paid dues to BGF leaders including a "Minister of Finance," who transferred a percentage of the funds using reloadable prepaid credit cards, especially "Green Dot" cards, to BGF leaders outside the facility.

      d.     BGF leaders, including Tavon WHITE, imposed a "tax" on non-BGF inmates who smuggled contraband inside BCDC and related facilities, and BGF leaders transferred a percentage of these funds to BGF leaders outside the facilities by transferring funds onto Green Dot cards.

      e.     The availability of contraband cell phones was the crucial device to link and coordinate all BGF criminal activity inside and outside the prison facilities.

      f.     BGF members and associates smuggled cell phones into BCDC and BCBIC both to sell within the prison to make money and to insure that cell phones were continuously available to inmate members to arrange sexual encounters, conduct the business of the enterprise, including drug trafficking, and to coordinate with members of the enterprise outside the prison.

      g.     CO's passed through screening upon entering BCDC.  BGF members and associates who were CO's carried the contraband into BCDC on their persons and in containers.  Although required to enter through the main entrance where screening takes place, CO's were often able to enter through other entrances such as one on Madison Street and passageways from the JI Building, WDC and BCBIC, and thereby avoid screening or be subject to minimal screening.

h.      Even entry through the main entrance of BCDC posed little

difficulty to CO's who were members and associates of the enterprise, since the

procedures and personnel there were completely inadequate to prevent

smuggling.  Female CO's associated with BGF concealed contraband in their

underwear, hair, internally, and elsewhere.  Most of the contraband would not be

detected by a metal detector, and the chances of being searched effectively were

remote.  Normally, only pat downs were applied, and these rarely led to

discoveries of contraband.  Even if the metal detector showed an unacceptable

amount of metal,  CO's entering the facility would not be searched and could

simply try again later, return to their vehicles or be waved through.  Supervisors

were not called to pat down a CO until the metal detector activated for a third

time.

i.      Instead of assigning certain employees to permanent duty

doing screening at the entrance, all CO's are rotated to guard the entrance as one

of their periodic duty stations.  This enabled a corrupt CO to simply wait until his

or her co-conspirators were assigned to the entrance and smuggle contraband at

that time.

j.      Since CO's are rotated through the entrance duty post, corrupt

CO's could call ahead or quickly inspect the personnel at the entrance to see if

smuggling would be a problem.   CO's could arrange their smuggling to avoid effective screening and supervisory personnel by arriving late or by returning to their vehicles to obtain contraband in the middle of their shifts.  The fact that there is no significant penalty for arriving late for work facilitated CO's associated with BGF to arrange their arrivals when co-conspirators were working or when the prospect of being effectively screened for contraband was minimized.

      k.     Inside the facility, BGF members and associates who were CO's transported contraband themselves or, more commonly, concealed it at prearranged locations and relied on "working men" to pick it up and transport it. "Working men" were inmates with work assignments that gave them some freedom of movement within BCDC and related prisons.

      l.     Although working men were paid positions selected by the CO's and other prison staff, the vast majority of working men were members and associates of BGF.  This monopoly of working men positions permitted BGF to dominate contraband smuggling inside BCDC and enabled BGF's general domination within BCDC.

      m.     BGF members and associates often had long-term sexual relationships with corrections officers associated with the enterprise.  These sexual relations cemented the business ties and the association of the corrections

officers with the enterprise. BGF members and associates even impregnated some corrections officers.

      n.    Inmates paid BGF members and associates for smuggled contraband with 14-digit numbers from Green Dot "MoneyPak" cards which are available in various denominations at retail stores. BGF members and associates then concealed the illegal source of their money by using their cell phones to text the 14-digit MoneyPak numbers to other members and associates, both inside and outside BCDC, who loaded the funds onto reloadable prepaid Green Dot cards. Alternatively BGF members and associates loaded the MoneyPak funds themselves onto Green Dot cards held by co-conspirators outside BCDC. BGF members and associates could then order payments from these Green Dot cards to pay for more contraband and purchase other commodities, even automobiles.

      o.    BGF members and associates also concealed the illegal source of funds by purchasing automobiles and other valuable property through nominees.

      p.    Besides coordination of the smuggling of contraband into prison, BGF members and associates used contraband cell phones to arrange sexual encounters, to disseminate information about arrests and releases of members and associates, to warn of investigations and contraband interdiction

efforts, to publicize the identities of persons believed to be cooperating with law enforcement, to order assaults and murders of such persons, as well as enemies of the enterprise, to provide updates to leaders on finances and all other BGF business, and to impose sanctions on members and associates perceived to be in violation of the rules of the enterprise.

q.     Corrupt CO's who were members or associates of BGF were able to smuggle contraband and maintain sexual relations with inmates because there was no effective punishment for persons suspected of such offenses. Although the offenses were clearly prohibited, administrative hurdles made the prospect of actual punishment very remote. Often suspected CO's were merely transferred to another facility in the immediate vicinity.

r.     Members and associates followed directions from the ranking BGF members in BCDC, especially Tavon WHITE. On January, 5, 2013, WHITE explained in an intercepted phone call: "This is my jail. You understand that? I'm dead serious.... I make every final call in this jail, ... and nothing go past me, everything come to me.... Any of my brothers that deal with anybody, it's gonna come to me. You see what I am saying? Everything come to me. Everything. Before a mother-f----- hit a n----- in the mouth, guess what they do, they gotta run it through me. I tell them whether it's a go ahead, and they can do

-14-

it or whether they hold back.  Before a mother-f----- stab somebody, they gotta

run it through me....  Anything that get done must go through me. "

s.    Tavon WHITE summarized his position in an intercepted

conversation with Adrena RICE on February 11, 2013: "I hold the highest seat

you can get.  So regardless of what anybody say, whatever I say is law.  Like I am

the law....  My word is law..., so if I told any mother-f------ body they had to do

this, hit a police, do this, kill a mother-f-----, do anything, it got to get done.

Period."

## Overt Acts

1.    Tavon WHITE entered a long-term sexual relationship with

Corrections Officer Jennifer OWENS, who had the name "Tavon" tattooed on her

neck, and in or about early 2011 WHITE impregnated OWENS inside BCDC.

2.    Tavon WHITE entered a long-term sexual relationship with

Corrections Officer Katera STEVENSON, who had the name "Tavon" tattooed

on her wrist, and in or about late spring, 2012, WHITE impregnated

STEVENSON inside BCDC.

3.    In or about the late spring of 2012, Tavon WHITE impregnated

Jennifer OWENS inside BCDC for the second time.

4.    In or about 2012, WHITE gave OWENS a diamond ring, allowed her

to drive a black Mercedes Benz and later allowed her to drive a white Mercedes Benz.  WHITE also allowed Katera STEVENSON to drive a white Mercedes Benz, and WHITE provided an Acura for Corrections Officer Chania BROOKS.

5.  Tavon WHITE entered a long-term sexual relationship with Corrections Officer Chania BROOKS, and in or about 2012, WHITE impregnated BROOKS inside BCDC.

6.  On or about May 30, 2012, James YARBOROUGH possessed marijuana with the intent to distribute.

7.  Tavon WHITE entered a long-term sexual relationship with Corrections Officer Tiffany LINDER, and in or about August, 2012, WHITE impregnated LINDER inside BCDC.

8.  On or about September 10-13, 2012,  Derius DUNCAN instructed Corrections Officer Kimberly DENNIS to smuggle cell phones and tobacco into BCDC, and DENNIS agreed to do so.

9.  On or about September 10-13, 2012, Ralph TIMMONS, JR., offered to Jennifer OWENS to facilitate the purchase of a gun for the use of Tavon WHITE when he got out of jail.

10.  On or about September 16, 2012, Tavon WHITE and Jennifer OWENS recruited Kimberly DENNIS to smuggle a cell phone into BCDC.

11.     On or about September 17, 2012,  Derius DUNCAN instructed Kimberly DENNIS to aid his marijuana distribution within BCDC by bringing him small zip-lock bags.

12.     On or about September 18, 2012, Jennifer OWENS aided the purchase of prescription pills by Tavon WHITE from Ralph TIMMONS, Jr.

13.     On or about September 18-19, 2012, Derius DUNCAN instructed Kimberly DENNIS to purchase and smuggle cell phones into BCDC.

14.     On or about September 22, 2012,  Kimberly DENNIS smuggled marijuana into BCDC.

15.     On or about September 29, 2012, Derius DUNCAN possessed narcotics and contraband cell phones that belonged to Kimberly DENNIS.

16.     On or about September 29, 2012, WHITE, directed  Joseph YOUNG, a BGF floor boss, to sanction or punish two inmates suspected of stealing contraband cell phones and drugs from DUNCAN.

17.     On or about October 1, 2012, Tyrone THOMPSON distributed prescription pills to Jennifer OWENS and Ralph TIMMONS, JR., for OWENS to smuggle into Tavon WHITE in BCDC.

18.     On or about October 9, 2012 Tavon WHITE ordered the beating of David Warren, a/k/a "Meshawn," as a sanction for stealing cell phones from

-17-

Derius DUNCAN.

19.     On or about October 13, 2012, James YARBOROUGH was in possession of Suboxones with the intent to distribute in BCDC.

20.     On or about October 14, 2012, Jennifer OWENS and Taryn KIRKLAND agreed to check the security scanners at BCDC and aid one another bringing in contraband.

21.     On or about October 15, 2012, Tavon WHITE and Jennifer OWENS arranged for Suboxones to be smuggled into BCDC for distribution.  WHITE told OWENS that, when she smuggled in the Suboxone strips, she would be able to deliver them directly to him because Corrections Officer Jasmine THORNTON was assigned to his tier.

22.     On or about October 15, 2012, Kimberly DENNIS distributed prescription pills, marijuana and tobacco to Anthony MILLER, a/k/a Worm, inside BCDC.

23.     On or about October 15-17, 2012, Kimberly DENNIS, Derius DUNCAN and Joseph YOUNG agreed to an arrangement whereby DENNIS would bring marijuana to DUNCAN and tobacco to YOUNG.

24.     On or about October 17, 2012, Derius DUNCAN and Kimberly DENNIS arranged to smuggle prescription pills and tobacco to Joseph YOUNG,

a/k/a Monster.

25.    On or about October 20, 2012, James YARBOROUGH agreed to obtain Percocets for Kimberly DENNIS.

26.    On or about October 28, 2012, Jennifer OWENS bought a 745i BMW that WHITE selected.  WHITE instructed Ralph TIMMONS, Jr., to turn over $8500 to OWENS to make the purchase.

27.    In or about November, 2012, Corrections officer Jasmin JONES stood guard outside a closet in BCDC so that Kimberly DENNIS and Derius DUNCAN could have sex.

28.    On or about November 5, 2012, Kimberly DENNIS agreed to smuggle marijuana to Joseph YOUNG.

29.    On or about November 6, 2012, Kimberly DENNIS agreed to smuggle contraband cell phones into BCDC so the Derius DUNCAN and Joseph YOUNG could sell them

30.    On or about November 7, 2012, Joseph YOUNG arranged with an unknown associate for that packaging of marijuana he was smuggling into BCDC.  YOUNG explained to the associate to buy marijuana at $350/ounce and then package it in one-gram bags, which he would sell for $50 inside BCDC.  At 28g/ounce, YOUNG explained, they would make over $1000 in profit for each

ounce.

31.     On or about November 9, 2012, Kimberly DENNIS smuggled Percocets to Derius DUNCAN.

32.     On or about November 10, 2012, Tavon WHITE arranged to transfer funds to Ralph TIMMONS, Jr., to pay a CO for tobacco and phones smuggled into  BCDC for WHITE

33.     On or about November 10, 2012, Kimberly DENNIS assisted Ebonee BRASWELL in obtaining an ounce of marijuana.

34.     On or about November 9-11, 2012, Tavon WHITE, Ralph TIMMONS, Katera STEVENSON and Adrena RICE arranged to smuggle cell phones and tobacco into BCDC.

35.     On or about November 11 -12, 2012, Vivian MATTHEWS possessed Schedule III controlled substance including alprazalam (Xanax), hydrocodone (Lortab) and clonazepam (Klonopin) with the intent to distribute and offered them for sale to Tavon WHITE.

36.     On or about November 12, 2012, Joseph YOUNG requested Kimberly DENNIS to acquire prescription pills.

37.     On or about November 12, 2012, Tavon WHITE used Green Dot cards to transfer funds to Ralph TIMMONS, Jr.

38.     On or about November 12, 2012, Vivian MATTHEWS offered to assist Tavon WHITE in contraband smuggling outside BCDC by obtaining Xanax pills that others would take into BCDC.

39.     On or about November 15, 2012, Vivian MATTHEWS declined to smuggle Xanax pills into BCDC for Tavon WHITE, but volunteered to obtain them and drop them off for someone else to smuggle.

40.     On or about November 16, 2012, Tavon WHITE solicited Percocets from Ralph TIMMONS, Jr. , and Vivian MATTHEWS delivered Xanax pills to TIMMONS to be smuggled into BCDC.

41.     On or about November 16, 2012, Vivian MATTHEWS and Ralph TIMMONS, Jr.,  possessed with intent to distribute Percocets and Xanax pills.

42.     On or about November 17, 2012, Joseph YOUNG possessed Xanax pills with the intent to distribute them.

43.      On or about November 18, 2012, Tavon WHITE informed Tyesha MAYO how she would receive payments for prescription pills that she acquired and who to give them to to smuggle them into BCDC.

44.     On or about November 19, 2012, Jennifer OWENS picked up Percocets from Teshawn PINDER to smuggle to Tavon WHITE.

45.     On or about November 22, 2012, Kimberly DENNIS learned of her

reassignment to a job that would limit her movements, so she solicited other CO's to take her place delivering contraband to Derius DUNCAN.

46.     On or about November 22-23, Ralph TIMMONS, Jr., arranged with Tavon WHITE for Tiffany LINDER to pick up pills from him to be smuggled into BCDC for WHITE, and LINDER did so.

47.     On or about November 23, 2012, Kimberly DENNIS possessed Percocets with the intent to distribute them.

48.     On or about November 23, 2012, James YARBOROUGH was in possession of Percocets with the intent to distribute.

49.     On or about November 24, 2012, Jasmine THORNTON smuggled in a cell phone for Jamar ANDERSON and then called ANDERSON to explain that the SIM card was taped to the back of the phone and gave him the code to activate minutes on the phone.

50.     On or about November 26, 2012, Katera STEVENSON agreed with Ralph TIMMONS, Jr., to pick up Suboxones to be smuggled into Tavon WHITE.

51.     On or about November 27, 2012, Tavon WHITE ordered Percocet pills from Tyrone THOMPSON and arranged for them to be picked up by Katera STEVENSON and Ralph TIMMONS, Jr.

52.     On or about November 28, 2012, Katera STEVENSON picked up

prescription pills from Ralph TIMMONS, Jr., to be smuggled into BCDC.

53.    On or about November 28-29, 2012, Jamar ANDERSON and Jasmine THORNTON arranged to smuggle a SIM card into BCDC for Tavon WHITE and a cell phone for ANDERSON, and THORNTON arranged for the activation of both.

54.    On or about November 29, 2012, On behalf of Derius DUNCAN, Kimberly DENNIS recruited Ebonee BRASWELL to smuggle two ounces of marijuana and Suboxones into BCDC.

55.    On or about December 24, 2012, Tiffany LINDER attempted to make a payment for Tavon WHITE'S contraband cell phone.

56.    On or about December 2, 2012, Antonia ALLISON attempted to smuggle marijuana into BCDC for Tavon WHITE.

57.    On or about December 11-12, 2012, Tyesha MAYO sold prescription pills to Tavon WHITE for sale inside BCDC.

58.    On or about December 12-13, 2012, Tavon WHITE sold prescription pills and marijuana to Steven LONEY to be distributed in BCDC.

59.    On or about December 13, 2012, Katera STEVENSON agreed to smuggle a cell phone to a BGF member at BCDC.

60.    On or about December 14, 2012, Steven LONEY enlisted the help of

an associate to purchase marijuana.

61.     On or about December 14, 2012, Adrena RICE and Katera
STEVENSON agreed to smuggle marijuana into BCDC.

62.     On or about December 15, 2012, Jermaine McFADDEN arranged for
Katera STEVENSON to smuggle a cell phone and tobacco into the JI Building.

63.     On or about December 15, 2012, Tavon WHITE offered additional
prescription pills to Steven LONEY to be distributed in BCDC.

64.     On or about December 15, 2012, Steven LONEY received and
possessed marijuana and tobacco to be distributed in BCDC.

65.     On or about December 16, 2012, Jasmin JONES laundered money
for Jamar Anderson, a/k/a Hammer, by loading a Green Dot card.

66.     On or about December 16, 2012, Tavon WHITE provided Ralph
TIMMONS with information about a drug source ready to supply prescription
pills.

67.     On or about December 17, 2012, Tyesha MAYO sold marijuana to
Tavon WHITE which was to be picked up by Katera STEVENSON for
smuggling into BCDC.

68.     On or about December 17, 2012, Tyesha MAYO laundered money
by receiving Green Dot numbers into a Green Dot account on behalf of Tavon

WHITE.

69.    On or about December 17, 2012, Katera STEVENSON picked up and possessed marijuana with the intent to distribute.

70.    On or about December 18, 2012, Tavon WHITE and Ralph TIMMONS, Jr., purchased prescription pills for distribution inside BCDC.

71.    On or about December 19, 2012, Tavon WHITE arranged with Jennifer OWENS and Adrena RICE to have Suboxones and other prescription pills smuggled into BCDC with aid from Chania BROOKS.

72.    On or about December 19, 2012, Katera STEVENSON picked up and possessed marijuana and prescription pills with the intent to distribute.

73.    On or about December 20, 2012, Tavon WHITE instructed Ralph TIMMONS, Jr., to pay $600 to Chania BROOKS for prescription pills she provided.

74.    On or about December 20, 2012, Vivian MATTHEWS got Xanax pills to be smuggled into Tavon WHITE at BCDC.

75.    On or about December 21, 2012, Kimberly DENNIS and James YARBOROUGH were in possession of marijuana with the intent to distribute it.

76.    On or about December 22, 2012, Tavon WHITE arranged for Tyesha MAYO to pick and hold prescription pills to be distributed in BCDC.

77.     On or about December 22, 2012, Jermaine McFADDEN arranged for Katera STEVENSON to pick up marijuana and smuggle it into the JI Building.

78.     On or about December 22, 2012, Tyrone THOMPSON offered to sell prescription pills to Ralph TIMMONS, Jr..

79.     On or about December 23, 2012, Jermaine McFADDEN arranged for Katera STEVENSON to smuggle a cell phone into the JI Building.

80.     On or about December 23, 2012, Tavon WHITE arranged the sale of a cell phone to another inmate  inside BCDC.

81.     On or about December 24, 2012, Tyrone THOMPSON offered to sell prescription pills to Ralph TIMMONS.

82.     On or about December 30, 2012, Antonia ALLISON informed WHITE that she preferred to smuggle pills and tobacco to WHITE, as opposed to other kinds of contraband, and WHITE agreed to that.

83.     On or about December 31, 2012, Vivian MATTHEWS informed Tavon WHITE that she had Xanaxes ready to be smuggled to him.

84.     On or about December 31, 2012, Jasmin JONES alerted Chania BROOKS that canine scans were ready to commence inside BCDC, and BROOKS immediately notified Tavon WHITE.

85.     On or about January 4, 2013, Jamar ANDERSON arranged with

Jasmin JONES to smuggle marijuana to be obtained from Teshawn PINDER, who agreed to provide it to JONES.

86.    On or about January 6, 2013, Tiffany LINDER tipped off Tavon WHITE about impending cell searches, so that BGF members would be able to conceal or dispose of contraband; WHITE passed the warning on to subordinates including Jamar HAMMER and Joseph YOUNG.

87.    On or about January 9, 2013, Tavon WHITE arranged with Antonia ALLISON and Katera STEVENSON to obtain Suboxones and other prescription pills, as well as marijuana, to smuggle into BCDC, and WHITE contacted Ralph TIMMONS, Jr., to have him transfer Suboxones and prescription pills to ALLISON, and WHITE transferred money to ALLISON.

88.    On or about January 10, 2013, Katera STEVENSON possessed marijuana with the intent to distribute it and was arrested.

89.    On or about January 14, 2013, Ebonee BRASWELL purchased Percocets with the intent to distribute them.

90.    On or about January 16, 2013, Jamar ANDERSON arranged for Jasmine THORNTON to aid him in smuggling marijuana to him.

91.    On or about January 16, 2013, Jamar ANDERSON transmitted MoneyPak numbers to Jasmine THORNTON and thereby laundered money .

92.     On or about January 16, 2013, Katrina LAPRADE smuggled marijuana into BCDC on behalf of Steven LONEY.

93.     On or about January 18, 2013, Ebonee BRASWELL instructed a drug-trafficking associate on their business and explained that she purchased Percocet pills for $10 and takes them into the prison where she makes 2 ½ to 3 times as much.

94.     On or about January 19, 2013, Taryn KIRKLAND instructed Stephen LONEY to tell Katrina LAPRADE to call KIRKLAND in order to receive marijuana to be smuggled into BCDC.

95.     On or about January 20, 2013, Ebonee BRASWELL attempted to possess Percocets with the intent to distribute them.

96.     On or about January 20, 2013, Steven LONEY ordered marijuana from Katrina LAPRADE, and she agreed to provide it.

97.     On or about January 21, 2013, Taryn KIRKLAND laundered money from Steven Loney by maintaining a ledger of LONEY'S drug customers Green Dot account numbers and recording transactions on them.

98.     On or about January 21, 2013, Ebonee BRASWELL attempted to possess Percocets with the intent to distribute them.

99.     On or about January 23, 2013, Ebonee BRASWELL attempted to

possess Percocets with the intent to distribute them.

100.   On or about January 23, 2013, Steven LONEY distributed Suboxones inside BCDC.

101   On or about January 26, 2013, Stephen LONEY instructed Taryn KIRKLAND to send funds to Katrina LAPRADE by loading it onto a Green Dot card.

102.   On or about February 1, 2013, Tavon WHITE requested that Ralph TIMMONS, Jr., and Adrena RICE obtain prescription pills for WHITE that would be smuggled into BCDC by Adrena RICE.

103.   On or about February 2, 2013, Adrena RICE was in possession of marijuana with the intent to deliver it to Tavon WHITE for distribution in BCDC.

104.   On or about February 2, 2013, Antonia ALLISON smuggled marijuana into Tavon WHITE in BCDC.

105.   On or about February 2, 2013, Tavon WHITE and an unknown male requested that Ralph TIMMONS, Jr., obtain Klonopin pills to be smuggled into BCDC.

106.   On or about February 5, 2013, Tavon WHITE requested that Ralph TIMMONS, Jr., obtain prescription pills for WHITE.

107.   On or about February 6, 2013, Kenneth PARHAM arranged to have

Suboxones and other prescription pills acquired by Tyesha MAYO to be smuggled into BCDC on behalf of WHITE.

108.   On or about February 8, 2013, Teshawn PINDER was in possession of marijuana with the intent to deliver it to Jasmine THORNTON to distribute on behalf of Jamar Anderson.

109.   On or about February 8, 2013, Adrena RICE agreed to obtain Percocets and other prescription pills for Tavon WHITE.

110.   On or about February 9, 2013, Ralph TIMMONS, Jr., agreed to pick up Xanax pills to be smuggled into BCDC.

111.   On or about February 11 2013, Kenneth PARHAM requested that Ralph TIMMONS, Jr., obtain Percocets and marijuana to be smuggled into BCDC on behalf of Tavon WHITE.

112.   On or about February 11, 2013, Adrena RICE provided to Tavon WHITE a telephone number for a supplier of prescription pills.

113.   On or about February 11, 2013, Tavon WHITE arranged for Ralph TIMMONS, Jr., to obtain prescription pills to be smuggled into BCDC.

114.   On or about February 12, 2013, Tavon WHITE arranged for Adrena RICE to smuggle prescription pills into BCDC.

115.   On or about February 14, 2013, Kenneth PARHAM concealed SIM

cards for cell phones in an attempt to prevent their seizure by a contraband

interdiction team at BCDC.


18 U.S.C. § 1962(d)
18 U.S.C. § 1963

## COUNT TWO

And the Grand Jury for the District of Maryland further charges that:

From in or about 2009, up to on or about the date of this Indictment, in the

District of Maryland, and elsewhere,

**TAVON WHITE,**
**a/k/a "Bulldog," "Tay,"**
**ANTONIA ALLISON,**
**JAMAR ANDERSON,**
**a/k/a "Hammer,"**
**"Hamma Head,"**
**EBONEE BRASWELL,**
**CHANIA BROOKS,**
**KIMBERLY DENNIS,**
**DERIUS DUNCAN,**
**JASMIN JONES,**
**a/k/a "JJ"**
**TARYN KIRKLAND,**
**KATRINA LAPRADE,**
**a/k/a Katrina Lyons,**
**TIFFANY LINDER,**
**STEVEN LONEY,**
**a/k/a "Stevie,"**
**VIVIAN MATTHEWS,**
**TYESHA MAYO,**
**JERMAINE McFADDEN,**
**a/k/a "Maine,"**
**JENNIFER OWENS,**
**a/k/a "O," "J.O.,"**
**KENNETH PARHAM,**
**TESHAWN PINDER**
**ADRENA RICE,**
**KATERA STEVENSON,**

-32-

a/k/a "KK,"
**TYRONE THOMPSON,**
a/k/a "Henry,"
**JASMINE THORNTON,**
a/k/a "JT'"
**RALPH TIMMONS, JR.,**
a/k/a "Boosa,"
**JAMES YARBOROUGH,**
a/k/a "J.Y.,"
**JOSEPH YOUNG,**
a/k/a "Monster,"

did knowingly, willfully and unlawfully conspire with each other and with others

known and unknown to the Grand Jury to knowingly, intentionally and

unlawfully distribute and possess with intent to distribute a quantity of a mixture

or substance containing oxycodone, also known as Percocet and OxyContin, a

Schedule II controlled substance; a quantity of a mixture or substance containing

buprenorphine, also known as Suboxone, a Schedule III controlled substance; a

quantity of a mixture or substance containing alprazalam, also known as Xanax, a

Schedule IV controlled substance; clonazepam, also known as Klonopin, a

Schedule IV controlled substance;  hydrocodone, also known as Lortab, Lorcet

and Vicodin, a Schedule III controlled substance; methadone, a Schedule I

controlled substance; and a quantity of a mixture or substance containing

marijuana, a Schedule I controlled substance, in violation of Title 21, United

-33-

States Code § 841(a).

21 U.S.C. § 846

## COUNT THREE

The Grand Jury for the District of Maryland charges that:

From in or about 2009 through the date of this Indictment, in the District of

Maryland and elsewhere, the defendants,

**TAVON WHITE,**
**a/k/a "Bulldog," "Tay,"**
**ANTONIA ALLISON,**
**JAMAR ANDERSON,**
**a/k/a "Hammer,"**
**"Hamma Head,"**
**EBONEE BRASWELL,**
**CHANIA BROOKS,**
**KIMBERLY DENNIS,**
**DERIUS DUNCAN,**
**JASMIN JONES,**
**a/k/a "JJ"**
**TARYN KIRKLAND,**
**KATRINA LAPRADE,**
**a/k/a Katrina Lyons,**
**TIFFANY LINDER,**
**STEVEN LONEY,**
**a/k/a "Stevie,"**
**TYESHA MAYO,**
**JERMAINE McFADDEN,**
**a/k/a "Maine,"**
**JENNIFER OWENS,**
**a/k/a "O," "J.O.,"**
**KENNETH PARHAM,**
**KATERA STEVENSON,**
**a/k/a "KK,"**
**JASMINE THORNTON,**
**a/k/a "JT'"**

**RALPH TIMMONS, JR.,**
a/k/a "Boosa,"
**JOSEPH YOUNG,**
a/k/a "Monster,"

did combine, conspire, and agree with each other and with other persons

known and unknown to the Grand Jury to commit offenses against the

United States, to wit:

(a) money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(I),

the elements of which are to knowingly conduct a financial transaction

affecting interstate and foreign commerce that involved the proceeds of

a specified unlawful activity, knowing that the property involved in the

transaction represented the proceeds of some form of unlawful activity,

and with the intent to promote the carrying on of specified unlawful

activity; and

(b) money laundering in violation of 18 U.S.C. §

1956(a)(1)(B)(I), the elements of which are to knowingly conduct a

financial transaction affecting interstate and foreign commerce that

involved the proceeds of a specified unlawful activity, knowing that

the property involved in the transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity.

## Manner and Means

The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

1.      Inmates paid the defendants for smuggled contraband with 14-digit numbers from Green Dot MoneyPak cards which are available in various denominations at retail stores.  The defendants then concealed the illegal source of their money by using their cell phones to text the 14-digit  MoneyPak numbers, or by conveying the numbers verbally or in writing, to other members and associates who loaded the funds onto reloadable prepaid Green Dot cards.

Alternatively the defendants loaded the MoneyPak amounts themselves onto Green Dot cards held by co-conspirators outside BCDC.  BGF

members and associates could then order payments from Green Dot cards to pay for more contraband and purchase other commodities to be held by co-conspirators.

2.    The defendants also concealed the illegal sources of funds by purchasing automobiles and other valuable property in the names of other persons, i.e., nominees.


18 U.S.C. § 1956(h)

## COUNT FOUR

And the Grand Jury for the State and District of Maryland further

charges that:

On or about January 10, 2013 within the State and District of

Maryland, and elsewhere,

### KATERA STEVENSON
### a/k/a "KK,"

did knowingly, intentionally and unlawfully possess with intent to

distribute a quantity of a mixture or substance containing a detectable

amount of marijuana, a Schedule I controlled substance.


21 U.S.C. § 841(a)(1)
18 U.S.C. § 2

## COUNT FIVE

And the Grand Jury for the State and District of Maryland further charges that:

On or about May 30, 2012, within the State and District of Maryland, and elsewhere,

### JAMES YARBOROUGH
### a/k/a "J.Y.,"

did knowingly, intentionally and unlawfully possess with intent to distribute a quantity of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance.

21 U.S.C. § 841(a)(1)
18 U.S.C. § 2

## COUNT SIX

And the Grand Jury for the State and District of Maryland further charges that:

On or about February 8, 2013, within the State and District of Maryland, and elsewhere,

## TESHAWN PINDER

did knowingly, intentionally and unlawfully possess with intent to distribute a quantity of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance.

21 U.S.C. § 841(a)(1)
18 U.S.C. § 2

## FORFEITURE

Upon conviction of one or more of the offenses set forth in

Counts One, Two and Three of this indictment, the defendants,

**TAVON WHITE,**
**a/k/a "Bulldog," "Tay,"**
**ANTONIA ALLISON,**
**JAMAR ANDERSON,**
**a/k/a "Hammer,"**
**"Hamma Head,"**
**EBONEE BRASWELL,**
**CHANIA BROOKS,**
**KIMBERLY DENNIS,**
**DERIUS DUNCAN,**
**JASMIN JONES,**
**a/k/a "JJ"**
**TARYN KIRKLAND,**
**KATRINA LAPRADE,**
**a/k/a Katrina Lyons,**
**TIFFANY LINDER,**
**STEVEN LONEY,**
**a/k/a "Stevie,"**
**VIVIAN MATTHEWS,**
**TYESHA MAYO,**
**JERMAINE McFADDEN,**
**a/k/a "Maine,"**
**JENNIFER OWENS,**
**a/k/a "O," "J.O.,"**
**KENNETH PARHAM,**
**TESHAWN PINDER**
**ADRENA RICE,**
**KATERA STEVENSON,**
**a/k/a "KK,"**
**TYRONE THOMPSON,**

a/k/a "Henry,"
**JASMINE THORNTON,**
a/k/a "JT'"
**RALPH TIMMONS, JR.,**
a/k/a "Boosa,"
**JAMES YARBOROUGH,**
a/k/a "J.Y.,"
**and**
**JOSEPH YOUNG,**
a/k/a "Monster,"

shall forfeit to the United States any property used, and intended to be used, in any manner or part, to commit, and to facilitate the commission of, such violations, including but not limited to the following automobiles:

2012 Chevrolet, MD license no. A237628, VIN 2G1FA1E36C9175677

2002 BMW, MD license no. 5AN8264, VIN WBAGL63412DP61040

2000 Mercedes Benz, MD license no. 4AW4605, VIN

WDBNG70J9YA060849

2000 Mercedes Benz, MD license no. 3AX7011, VIN

WDBLK70G4YT052205

2002 Acura, MD license no. 8AW5477, VIN 19UUA56602A026006

and shall forfeit to the United States all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of those offenses, all property traceable to such property, including but not limited to $500,000 and all interest and proceeds traceable thereto.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be

subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code Section 853(p) to seek forfeiture of any other property of the defendant up to the value of the property described above.

21 U.S.C. § 853

*Rod J. Rosenstein*
_____
ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

A TRUE BILL:

**SIGNATURE REDACTED**
_____
FOREPERSON

4-2-13
_____
DATE

-44-